# In the United States District Court for the Southern District of Georgia Waycross Division

MOHAMED LARADJI, Individually and as Guardian of P.A.L, a minor, and as Guardian of M.M.L., a minor,

    Plaintiff,

v.

MCCARTHY FARMS, INC.,

    Defendant.

CV 514-16

## ORDER

Plaintiff Mohamed Laradji claims he did not know what he was signing when he signed a nuptial agreement with his new wife to appease her family more than 15 years ago. Laradji, who was not conversational in English, says he trusted his wife when she told him that the nuptial agreement only concerned each partner's rights to the other's assets in the event of a divorce. After his wife died eleven years later, Laradji was surprised to discover that, in fact, the nuptial agreement also disinherited him from his wife's assets upon her death. Had he not been disinherited, Laradji would have received his wife's shares in Defendant McCarthy Farms, Inc., a closely-held

corporation owned by the wife's family. Under the McCarthy Farms shareholder's agreement, Defendant would have had to purchase any shares of the corporation that transferred to Laradji upon his wife's death. However, Defendant claims that because the nuptial agreement disinherited Laradji from his wife's estate, her shares transferred to her children who are not entitled to sell the shares to Defendant under the shareholder agreement.

Plaintiff seeks a declaration that Defendant must purchase the 245 shares his wife owned at the time of her death. See Complaint, Dkt. no. 1, p. 1. Defendant has filed a counterclaim, seeking a declaration that Defendant is not required to purchase the stock and that the wife's shares transferred to her children, and not Laradji, upon her death. Dkt. no. 7. Defendant has also filed a Motion for Summary Judgment, Dkt. no. 15, which is presently before the Court. At this juncture, the Court holds that the nuptial agreement is presumptively valid. The parties are invited to brief any additional arguments regarding the Defendant's rescission defense within 15 days of this Order.

**FACTUAL BACKGROUND**

For the purpose of resolving the Motion for Summary Judgment, the following facts are viewed in the light most favorable to Plaintiff, the nonmovant. See Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

AO 72A
(Rev. 8/82)

Plaintiff Mohamed Laradji was born in Algeria, where his primary languages were Arabic and French. Dkt. no. 17-2 Ex. C ("Pl.'s First Aff.") ¶¶ 3-4. He lived in Algeria for 22 years before enrolling in a doctoral program for physics at a university in Montreal, Quebec, Canada. Id. ¶¶ 3, 5. Plaintiff chose to enroll in the Montreal university specifically because French is the primary language in Quebec and Plaintiff could thus pursue his studies in a familiar language. Id. ¶ 6. Nevertheless, during his tenure in Quebec, Plaintiff says he learned to speak and understand English as applied to his specific field of scientific research. However, he still spoke French and Arabic in social settings. Id. ¶ 7.

From 1993 to 1994, Plaintiff completed a post-doctoral program at the University of Georgia in Athens, Georgia. Id. ¶ 9. During this time he taught, in English, an undergraduate physics course. Dkt. no. 15-1, ¶ 18; Dkt. no. 17-1, ¶ 18.[1] He also met Mary Rosann McCarthy ("Rosann") while residing in Athens. Pl.'s First Aff. ¶ 10. In 1994, Plaintiff and Rosann moved to Canada and married in Montreal. Id. ¶ 11-12.

---

[1] Defendant makes this factual proposition in its Statement of Material Facts (Dkt. no. 15-1), and cites to page 30 of Plaintiff's deposition to support it. Dkt. no. 15-1, ¶ 18. Page 30 of Plaintiff's deposition is not included in the excerpted portions of the deposition that Defendant filed, and is thus not properly in the record before the Court. See Dkt. no. 15-3 (excerpt of Plaintiff's deposition starting at page 50). Nevertheless, Plaintiff admits this fact in his Statement of Admitted Facts. See Dkt. no. 17-1, ¶ 18. The Court includes this fact in the Factual Background because it is not disputed. But even a dispute on this point would not change the outcome of this Order or the Court's eventual decision on Defendant's Motion for Summary Judgment.

In July of 1997, Plaintiff and Rosann traveled from Canada to Millwood, Georgia, to visit Rosann's family. Id. ¶ 16. One day during the trip, Rosann told Plaintiff that she wanted him to sign a document. Id. ¶ 17. Rosann explained that her mother, Patricia McCarthy, insisted Rosann and Plaintiff sign the document, and that she would be in trouble with her mother if they did not. Id. ¶¶ 18-19. Plaintiff says Rosann told him that the document was simply an agreement providing that neither party would be entitled to any property of the other if they got divorced. Id. ¶ 21. Plaintiff also says that neither Rosann nor any lawyer told him that it would have any effect other than controlling the disposition of the couple's assets upon divorce, or that it would disinherit a spouse if the other died, or that it contemplated each party making financial disclosures to the other, or, further, that it contemplated each party retaining independent legal counsel to represent them prior to signing the document. Id. ¶¶ 23-25, 30.

That day, Rosann took Plaintiff to an attorney's office. Id. ¶ 33. He was not given an opportunity to read the document before he went to the office or once he was there. Id. ¶ 43, 49. Even if he had been given the opportunity to read it, he would not have been able to—Plaintiff says that, at that time, he was "completely unable to read and comprehend certain complex documents written in English, such as legal papers." Id. ¶ 14,

AO 72A
(Rev. 8/82)

43. Plaintiff signed the document at Rosann's request and direction, without understanding the entire purpose and effect of the document. Id. ¶ 42. In agreeing to sign the document, Plaintiff says he "relied entirely on Rosann's representations as to the purpose and contents of the Agreement, and [his] love and trust in her." Id. ¶ 44. Because he thought the Nuptial Agreement only prevented him from taking Rosann's property if they divorced, Plaintiff says he thought it was "alright to sign." Id. ¶ 47. However, he says he would not have signed the Nuptial Agreement if he had known that it would disinherit him from Rosann's estate if she died first, thereby limiting his ability to care for the couple's two minor children. Id. ¶ 48.

Much later, in 2005, Defendant McCarthy Farms filed its Articles of Incorporation with the Georgia Secretary of State. Dkt. no. 15-1, ¶ 6; Dkt. no. 17-1, ¶ 6. Under the Shareholders' Agreement, Rosann was issued 245 of 1,000 shares of common stock in the corporation, or 24.5% of the company. Dkt. no. 15-5 ("Shareholders' Agreement"), p. 2. The Shareholders' Agreement states that, in the event of the death of a shareholder,

> unless the Decedent has transferred any and all interest in the Common Stock of the Corporation to an "immediate family member" as defined in Section 8, the Corporation shall purchase, and Decedent's personal representative shall sell, all of the shares of Common Stock of the Corporation owned by the Decedent at the time of her death.

Id. ¶ 3(a). Section 8 states: "For purposes of this Agreement, members of the 'immediate family' of a decedent . . . are hereby defined to mean such person's children, grandchildren and other lineal descendants or the other Shareholders." Id. ¶ 8.

Plaintiff and Rosann separated in 2006, but were still married when Rosann died intestate on December 18, 2008. Dkt. no. 15-1, ¶ 9; Dkt. no. 17-1, ¶ 9. Patricia McCarthy, Rosann's mother, was the executor of her estate. Dkt. no. 17-2 Ex. D ("Pl.'s Second Aff."), ¶ 5. Acting under the theory that Rosann's shares of common stock had passed to her children rather than to Plaintiff, Defendant failed to purchase Rosann's shares. Dkt. no. 15-1, ¶ 10; Dkt. no. 17-1, ¶ 10. Plaintiff did not learn of Defendant's and Patricia McCarthy's position that the Nuptial Agreement had disinherited him until the summer of 2012. Pl's Second Aff. ¶ 5.

**PROCEDURAL BACKGROUND**

Plaintiff filed his complaint seeking declaratory judgment on February 11, 2014. See Dkt. no. 4.[2] The Complaint requests an Order declaring that Defendant is obligated to purchase all of Rosann's stock as if it had transferred to Plaintiff, according to the provisions of the Shareholders' Agreement. Compl. 8. Plaintiff's Complaint does not mention the fact that he had

---

[2] Plaintiff initiated the lawsuit by filing a complaint on February 11, 2014. See Dkt. no. 1. The next day he filed a redacted Complaint, Dkt. no. 4, which is the operative complaint for purposes of this motion.

6

signed the Nuptial Agreement, and does not discuss its validity or effect on the disposition of Rosann's assets upon her death. Defendant answered Plaintiff's Complaint and counterclaimed on April 14, 2014. Dkt. no. 7. Defendant's Counterclaim seeks an Order declaring that Defendant is not required to purchase the shares of common stock Rosann owned at the time of her death and that, pursuant to the Nuptial Agreement and Georgia Code section 53-2-1(c)(1), Rosann's children were entitled to take Rosann's shares of the common stock. Id. at 14-15. Defendant also seeks an award for its costs, attorney's fees, and expenses.

Defendant filed the present Motion for Summary Judgment on September 25, 2014. Dkt. no. 15. Both parties have fully briefed the issues raised under Defendant's motion. See Dkt. nos. 17, 19, 21.

**LEGAL STANDARD**

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving

AO 72A
(Rev. 8/82)

party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

**DISCUSSION**

The dispositive issues at this stage of the case are whether the Nuptial Agreement Plaintiff signed in 1997 is valid and, if so, whether Plaintiff may rescind that Agreement. Defendant argues that the Nuptial Agreement is enforceable because Plaintiff is time-barred, under a variety of theories, from rescinding the agreement. Plaintiff counters that he does not seek to rescind the agreement because it is presumptively invalid and Defendant, who seeks to enforce the Nuptial

Agreement in its counterclaim, bears the burden of showing its validity.

## I. The Validity of Nuptial Agreements Under Georgia Law

Plaintiff argues that because Defendant is seeking to enforce the Nuptial Agreement and such agreements are, according to Plaintiff, presumptively invalid under Georgia law, the Defendant must proffer evidence of the Nuptial Agreement's validity. See Dkt. no. 17, pp. 7-8. Plaintiff bases this argument on a misreading of Scherer v. Scherer, 292 S.E.2d 662 (Ga. 1982), and subsequent case law.

In Scherer, the Georgia Supreme Court reconsidered the state's longstanding policy that "prenuptial agreements purporting to settle alimony in the event of a future divorce are void ab initio as against public policy since they were considered to be in contemplation of divorce." Id. at 664 (quoting Robert O. Davies, Validity of Prenuptial Contracts Which Fix Alimony, 14 Ga. St. Bar J. 18 (1977)). The Georgia Supreme Court distinguished the historical validity of nuptial agreements that take effect upon the death of a spouse from those that take effect upon divorce:

> Although prior Georgia decisions have upheld antenuptial agreements in which a spouse waived his or her rights in the other spouse's estate at death, antenuptial agreements in contemplation of divorce have been held invalid on the ground that such agreements are contrary to the policy of this state to hinder facility in the procurement of divorces.

AO 72A
(Rev. 8/82)

Id. (internal citations omitted).³ The court, though, recognized a national trend towards a more lenient approach to nuptial agreements in contemplation of divorce. Particularly, other courts had noted that the "sanctity" of marriage had "been greatly eroded in the last several decades" and that divorce had become a "commonplace fact of life," such that couples might want to discuss and agree upon the disposition of their property should the marriage fail. Id. at 665 (quoting Posner v. Posner, 223 So. 2d 381, 384 (Fla. 1970)). Furthermore, the policy arguments for voiding nuptial agreements in contemplation of divorce were founded on outdated notions of a woman's place in the home and her husband's duty to be her sole provider. Id. at 665-66 (quoting Volid v. Volid, 286 N.E.2d 42, 46-47 (Ill. Ct. App. 1972)). Nor, the court noted, should the historical reasons for voiding such nuptial agreements be applied to the increasing number of couples who have established wealth, marry later in life, do not care for minor children, and can otherwise function in society separately and independently. Id. at 666.

---

³ Indeed, as the Alaska Supreme Court observed, prenuptial agreements contemplating death, "since the time of Shakespeare, have been considered presumptively valid because they were seen as conducive to marital tranquility and preventing unnecessary litigation." Brooks v. Brooks, 733 P.2d 1044, 1048 n.4 (Alaska 1987) (citing, among other sources, WILLIAM SHAKESPEARE, THE TAMING OF THE SHREW act 2, sc. 1 ("And, for that dowry, I'll assure her of her Widowhood, be it that she survive me, In all my land and leases whatsoever. Let specialties be therefore drawn between us, That covenants may be kept on either hand.")).

AO 72A
(Rev. 8/82)

In light of these societal changes, the Georgia Supreme Court determined that, while nuptial arrangements in contemplation of divorce "should not be given carte-blanche enforcement," a Superior Court presented with a nuptial agreement in a divorce proceeding should presume the agreement is invalid unless it satisfies these three factors:

> (1) was the agreement obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of material facts? (2) Is the agreement unconscionable? (3) Have the facts and circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable?

Id. (citations omitted).

Plaintiff argues that even though the Georgia Supreme Court devised this test to be applied during divorce proceedings to nuptial agreements contemplating divorce, this Court should nevertheless apply the Scherer test to the agreement contemplating death in this case (which, in fact, was purportedly triggered upon one spouse's death rather than the couple's divorce) because the Georgia Court of Appeals has done so once before. But that Court of Appeals case, Hiers v. Estate of Hiers, 628 S.E.2d 653 (Ga. Ct. App. 2006), does not stand for this proposition.

In Hiers, a widowed plaintiff challenged the validity of the prenuptial agreement she had signed with her late husband that stipulated she would only receive $5,000 from his estate in

the event of a divorce or his death. <u>Hiers</u>, 628 S.E.2d at 655-56. She argued that the prenuptial agreement was invalid because it did not meet the criteria for a valid prenuptial agreement enumerated in <u>Scherer</u>. <u>Id.</u> at 656. The Court of Appeals observed that in <u>Scherer</u>, the Georgia Supreme Court had set forth "factors for the evaluation of prenuptial agreements made in contemplation of divorce," and had stated that prenuptial agreements "in which a spouse waives his or her rights in the other spouse's estate at death (as distinguished from agreements executed in contemplation of divorce) have long been valid in Georgia." <u>Id.</u> at 656-57 (citing <u>Scherer</u>, 292 S.E.2d at 666). After discussing <u>Scherer</u>, the court in <u>Hiers</u> concluded:

> The agreement between Mindy and Donald Hiers was made in contemplation of *both* divorce and death. However, it is undisputed that the agreement will never be used as a basis for the division of marital assets in a divorce because the husband has died. Nevertheless, **pretermitting whether <u>Scherer</u> applies given the facts of this case,** our review of the record reveals that the trial court's decision warrants affirmance even under <u>Scherer</u>.

<u>Id.</u> at 657 (italics in original, bold emphasis supplied). The court went on to analyze the <u>Scherer</u> factors as applied to that case.

Thus, while Plaintiff is technically correct that the court in <u>Hiers</u> applied the <u>Scherer</u> test "where a deceased spouse's heirs at law proffered a nuptial agreement made in anticipation of both divorce and death," Dkt. no. 17, p. 8, <u>Hiers</u> explicitly

12

withheld judgment on whether the <u>Scherer</u> test *should* apply generally to a joint death/divorce nuptial agreement a spouse seeks to void upon the other spouse's death. Furthermore, both the <u>Hiers</u> and <u>Scherer</u> courts observed that nuptial agreements contemplating only death *are* presumptively valid, and have been upheld in Georgia for some time. <u>Scherer</u>, 292 S.E.2d at 666; <u>Hiers</u>, 628 S.E.2d at 656-57.

The occurrence of joint death/divorce nuptial agreements, then, presents a twist on the traditional distinction between nuptial agreements contemplating divorce and those contemplating death. Particularly, these joint death/divorce agreements raise an interesting question as to their presumed validity. However, this Court believes that question is largely academic where a joint death/divorce agreement is enforced *only* upon the death of a spouse and will *never* be enforced pursuant to a divorce. Neither <u>Hiers</u> nor, to this Court's knowledge, any other Georgia case has held that joint death/divorce nuptial agreements are presumptively invalid when enforced upon the death of a spouse. And because the social policies undergirding the presumed invalidity of agreements contemplating divorce are not implicated where an agreement is enforced upon the death of a spouse, this Court sees no reason to presume Plaintiff's agreement with his late wife is invalid.

The Nuptial Agreement's severability clause further compels this conclusion: "The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted." Dkt. no. 15-2 ("Nuptial Agreement"), § 17. To the extent that the Nuptial Agreement is invalid as an agreement in contemplation of divorce, it will still stand valid and enforceable as an agreement in contemplation of death.

The Court presumes that Plaintiff's Nuptial Agreement with Rosann was valid, and the Scherer test is thus inapplicable. The Nuptial Agreement is enforceable, then, unless Plaintiff can establish grounds for rescission.

**II. How and When a Party May Rescind a Contract**

Having determined that the Nuptial Agreement is presumptively valid, the parties shall have 15 days to brief any additional arguments they have on the rescission issue in light of this holding.

**CONCLUSION**

The Nuptial Agreement is presumptively valid. The parties are **DIRECTED** to brief any additional arguments they have regarding the rescission question within 15 days of this Order.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 1ST day of July, 2015.

_/s/ Lisa Godbey Wood_
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)